| | |
|---|---|
| 1 | Daniel C. Girard (State Bar No. 114826) |
| 2 | Elizabeth C. Pritzker (State Bar No. 146267)<br>Alex C. Turan (State Bar No. 227273) |
| 3 | **GIRARD GIBBS LLP** |
| 4 | 601 California Street, Ste. 1400<br>San Francisco, CA 94108 |
| 5 | Tel: (415) 981-4800<br>Fax: (415) 981-4846 |

**ORIGINAL FILED**

JAN 2 0 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

E-filing

Mary Jane Fait (*pro hac vice*)
Theodore B. Bell (*pro hac vice*)
John E. Tangren (*pro hac vice*)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ, LLC**
55 W. Monroe Street, Suite 1111
Chicago, IL 60603
Tel: (312) 984-0000
Fax: (312) 984-0001

*Attorneys for Plaintiff Melanie Polk-Stamps*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JCS

| | |
|---|---|
| MELANIE POLK-STAMPS, individually, on behalf of Herself and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>NETFLIX, INC., WAL-MART STORES, INC., and, WALMART.COM USA LLC<br><br>Defendant. | Case No. CV 09 0244<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

CLASS ACTION COMPLAINT

dockets.Justia.com

Plaintiff, Melanie Polk-Stamps, on behalf of herself and all others similarly situated (the "Class", defined below), brings this action under the federal antitrust laws against the above-captioned Defendants. Plaintiff makes the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based on personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, the investigation conducted by her attorneys.

## NATURE OF THE ACTION

1. On or about May 19, 2005, Netflix, Inc. ("Netflix"), Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Walmart.com USA LLC ("Walmart.com"), a wholly owned subsidiary of Wal-Mart Stores, entered into a contract, combination, and conspiracy (the "Market Division Agreement") to divide the markets for the online rentals of Digital Video Discs ("DVDs") and for the sale of new DVDs in the United States. The purpose and effect of Defendants' illegal conduct and agreement is to monopolize and unreasonably restrain trade in the online DVD rental market.

2. The meetings that culminated in the illegal agreement began in early 2005, when the CEO of Netflix and the then CEO of Walmart.com met to discuss the online DVD rental business and the new DVD sales business. The CEOs wanted to discuss ways in which they could reduce or eliminate competition and thereby increase their profits. Reed Hastings, the CEO of Netflix, having "noticed how low Wal-Mart's prices [for DVDs] were," has admitted that he "called the CEO [of Walmart.com] in January and asked if he could have dinner." John Fleming, then the CEO of Walmart.com, who reported directly to Wal-Mart Stores' CEO Lee Scott, accepted Hastings' invitation. As a result of this dinner meeting, as well as other meetings and exchanges, Defendants entered into the contract, combination, and conspiracy alleged herein.

3. At the time of their initial meeting and prior to entering into to the Market Division Agreement, Netflix and Walmart.com were direct competitors in the online rental DVD market and were potential competitors in selling new DVDs to customers. Wal-Mart Stores and Walmart.com were already selling new DVDs and Netflix was preparing to enter that market. No later than May 19, 2005 however, Netflix, Wal-Mart Stores, and Walmart.com entered into an agreement whereby Walmart.com would stop competing with Netflix in the online DVD rental market, and in return, Netflix would

promote the sales of new DVDs by Wal-Mart Stores and Walmart.com. Netflix also agreed not to sell new DVDs that would have been in direct competition with Wal-Mart Stores and Walmart.com.

4.  Wal-Mart Stores actively participated in this conspiracy. This is confirmed by, among other things, the fact that prior to the announcement of the Market Division Agreement, John Fleming was promoted to Chief Marketing Officer of Wal-Mart Stores. As of the time of the announcement of the Market Division Agreement, Fleming thus was acting in his capacity both as the Chief Marketing Officer of Wal-Mart Stores and the Wal-Mart Stores executive responsible for overseeing the operations of Walmart.com. As Chief Marketing Officer of Wal-Mart Stores, Fleming was responsible for deciding "what the largest, most powerful retailer in history will stock on its shelves, and how much those products will cost. Such decisions, when made at Wal-Mart, can help make or break entire industries."

5.  As a result of the Defendants' contract, combination, and conspiracy, Netflix was able to charge its customers higher subscription prices for the rental of DVDs than it otherwise would have been able to charge. In addition, Netflix unlawfully acquired and maintained market and monopoly power.

6.  Under the Market Division Agreement, Netflix, Wal-Mart Stores, and Walmart.com agreed that they would restrain trade and eliminate competition. Wal-Mart Stores and Walmart.com agreed that Walmart.com would stop competing with Netflix in the online DVD rental market and Netflix agreed that it would not sell new DVDs and instead would promote the DVD sales of Wal-Mart Stores and Walmart.com. In agreeing to promote the sale of DVDs by Wal-Mart Stores and Walmart.com, Netflix provided consideration for the agreement by Wal-Mart Stores and Walmart.com to exit the online DVD rental market and simultaneously confirmed to Wal-Mart Stores and Walmart.com that Netflix would not enter the market to sell new DVDs. Netflix was well-positioned to enter the new DVD sales market, and had the unilateral economic incentive to do, so but refrained from doing so as a result of the Market Division Agreement. Since entering into the Market Division Agreement, neither Wal-Mart Stores nor Walmart.com has rented DVDs online and Netflix has not sold new DVDs. The Market Division Agreement served to entrench and enhance Defendants' dominant market positions and otherwise harmed competition, including by enabling Netflix to charge higher subscription prices for online DVD rentals than it would have charged had it not entered into the

agreement. In fact, Plaintiff and all other similarly situated customers paid the higher subscription prices to Netflix than they otherwise would have paid.

7. As alleged below, this case is brought as a class action on behalf of all persons in the United States who, during the period May 19, 2005 to the present (hereinafter, the "Class Period"), paid a subscription fee to rent DVDs from Netflix. Plaintiff brings this action under Sections 4 and 16 of the Clayton Antitrust Act to seek redress in the form of treble damages and other relief for their injuries resulting from Defendants' violations of law on behalf of themselves and other similarly injured persons nationwide and to seek a declaration that the Market Division Agreement is null and void.

## PLAINTIFF

8. Melanie Polk-Stamps ("STAMPS") is an individual customer who resides in Chicago, Illinois. During the Class Period, Stamps directly subscribed to Netflix for her personal, non-commercial use. The subscription fees she paid to Netflix for renting DVDs were greater than she would have paid, but for the antitrust violations alleged herein.

## DEFENDANTS

9. Defendant Netflix is a publicly traded Delaware corporation with its headquarters located at 100 Winchester Circle, Los Gatos, California, 95032. Netflix' revenues exceed $1 billion annually. Netflix, through the internet, rents DVDs directly to customers nationwide by charging monthly subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans. At all times during the Class Period, Netflix has had a market share of at least 75% of the online DVD rental market in the United States, as defined herein.

10. Defendant Wal-Mart Stores is the largest retailer in the United States. Wal-Mart Stores is a publicly traded Delaware corporation with its headquarters located at 702 S.W. 8th Street, Bentonville, Arkansas, 72716. Wal-Mart Stores' revenues are approximately $400 billion annually. Through its retail stores and the internet, Wal-Mart Stores sells DVDs directly to customers nationwide. Wal-Mart Stores sells far more DVDs than any other retailer in the United States, accounting for about 40% of all new DVDs sold to customers domestically. Prior to the Market Division Agreement, Wal-Mart Stores' wholly-owned subsidiary Walmart.com competed with Netflix in the online DVD rental market through the "Walmart DVD Rentals" service, which was available on www.walmart.com.

11. Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores. Walmart.com is a Delaware corporation with its headquarters located at 7000 Marina Boulevard, Brisbane, California, 94005. It is the online component of Wal-Mart Stores' retail empire that is the leading seller of new DVDs in the United States. Prior to the conspiracy alleged herein, Walmart.com was also a major competitor of Netflix in the online DVD rental market through the "Walmart DVD Rentals" service, which was available on www.walmart.com. While its financials are not publicly reported by Wal-Mart Stores, Walmart.com is ranked as the 14th largest online retailer in the United States. Through the website www.walmart.com, Walmart.com sells DVDs directly to customers nationwide. Customers who purchase DVDs via www.walmart.com may have them either mailed or otherwise delivered to them directly, or may pick them up at a Wal-Mart Stores retail location via Walmart.com's and Wal-Mart Stores' "Site to Store" program.

12. Walmart.com is the internet sales channel for Wal-Mart Stores, rather than an independent business entity. They are, in essence, completely integrated, operating as a single commercial enterprise and holding themselves out as such to the public. Wal-Mart Stores is the registrant of the www.walmart.com domain name that is used to sell products and services by Walmart.com. Likewise, Wal-Mart Stores is the registrant of www.walmartdvdrentals.com. Wal-Mart Stores' Chief Marketing Officer John Fleming has explained the relationship between Wal-Mart Stores and Walmart.com as follows: "Wal-Mart Stores set up Walmart.com as a separate company with some outside investors, but within six months Wal-Mart Stores bought back the outside interest and Walmart.com; Walmart.com now serves as a 'marketing channel' for Wal-Mart Stores."

13. Wal-Mart Stores was actively involved in the conspiracy alleged herein. For purposes of these allegations, both Wal-Mart Stores and Walmart.com are active participants in the conspiracy and each is liable for the unlawful conduct alleged herein, with each, among other things, participating in, and benefiting from, the Market Division Agreement. Moreover, Wal-Mart Stores directed, ratified, approved, supported, and otherwise aided and abetted Walmart.com's violations of law.

14. Wal-Mart Stores had a strong incentive to accomplish the Market Division Agreement. In addition to its interests as the 100% owner of Walmart.com, Wal-Mart Stores had further incentive to enter into this Agreement, since it obtains substantial revenues from sales of new DVDs, as well as in-

store traffic resulting in the sales of other goods. These revenues would have been threatened by Netflix' entry into the market for new DVD sales but instead, they were enhanced by Netflix' promotion of Wal-Mart Stores and Walmart.com through the Market Division Agreement.

15. Whenever reference is made in this Complaint to a statement or transaction of any corporation or entity, the allegation means that the corporation or entity acted by or through its directors, members, partners, officers, employees, affiliates, or agents, while engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within its scope of authority.

## JURISDICTION AND VENUE

16. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, to receive treble damages and costs of suit, including reasonable attorneys' fees, against the Defendants for the injuries sustained by Plaintiff and the members of the Class by reasons of the violations, as alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17. This action is also instituted to secure injunctive relief against the Defendants to prevent them from further violations of the antitrust laws.

18. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 & 1337 and 15 U.S.C. §§ 1-2, 15 & 26, as the case arises under the laws of the United States.

19. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 & 26 and pursuant to 28 U.S.C. § 1391(b), (c) & (d). Venue is proper in this judicial district because during the Class Period the Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiff claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

20. This court has *in personam* jurisdiction over Defendants because they engaged in illegal schemes that were directed at and had the intended effect of causing injury to persons or entities residing in, located in, or doing business throughout the United States.

## CO-CONSPIRATORS

21. Various other persons, firms and corporations, not named as a defendant in this Complaint, may have participated as co-conspirators with the Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

## INTRADISTRICT ASSIGNMENT

22. Pursuant to Civil L.R. 3-2, this case should be assigned to the San Francisco Division because a substantial part of the events giving rise to the claims occurred within this division. Defendant Walmart.com is headquartered in San Mateo County.

## RELEVANT MARKET

23. Defendants' market allocation conspiracy is *per se* illegal and requires no allegation of market definition.

24. To the extent applicable to the claims alleged herein, the relevant product market is the market for the rental of DVDs online, by subscription, for delivery by mail ("online DVD Rental Market"). The relevant geographic market is the United States and its territories. During the Class Period, Netflix' share of the online DVD rental market in the United States and its territories was approximately 75%.

25. DVDs contain commercially recorded entertainment programs for personal viewing, normally movies or previously aired television programs. At all relevant times, there have been no reasonably interchangeable substitutes for the service of online DVD rentals, which is differentiated, on both the demand and the supply side, from other methods of DVD distribution, as well as other methods of entertainment content delivery.

## FACTUAL ALLEGATIONS

26. In the online DVD Rental Market, in return for a monthly subscription fee, a customer may rent DVDs from an online service provider, such as Netflix, Blockbuster Online, or prior to the Market Division Agreement, Walmart DVD Rentals. The subscription fee determines the number of DVDs customers can rent in a given month and how many DVDs they may rent at one time. Thus, customers with the same subscription plan pay the same amount, irrespective of whether they rent one DVD or more than one DVD in a given month.

27.     The entire transaction is completed over the internet and through the United States postal service. To rent DVDs, customers log onto a company's website, such as Netflix.com, and select which DVDs they would like to receive. Customers can then rank the DVDs in order of preference. The rental company then ships the DVDs to the customer's home by first class mail. After watching the DVD the customer simply returns it in a prepaid envelope provided by the rental company. Upon receipt the rental company would then mail the next DVD to the customer based on the rankings previously provided by the customer.

28.     The online DVD rental business is a differentiated service that is not reasonably interchangeable with traditional brick-and-mortar video rental. The traditional brick-and-mortar stores differ in significant respects from online DVD rentals, including the way in which the rentals are priced, and the method for obtaining the rental. In a traditional video rental from physical stores, customers must drive to the store and pay for each DVD rental and potentially pay late fees if the DVD is not returned within a predetermined number of days - usually one to three. In addition, the selection offered by a brick-and-mortar store is significantly smaller than the selection available from an online DVD rental company. Netflix' catalog of DVDs, for example, now numbers in excess of 100,000 titles and is continuing to grow ever larger.

29.     Even the Defendants recognize that the online DVD market differs substantially from other methods for renting DVDs. Executives from Netflix and Walmart.com and Wal-Mart Stores executives alike, including Hastings and Fleming, have admitted as such. A Netflix executive has stated that other types of rental services, such as kiosk and in-store rentals, do not present a direct competitive threat to Netflix and that while video downloads may be a competitive force in the future, DVD will be the dominant medium for years to come.

30.     Online DVD rentals are also a separate market from DVD sales. First, the pricing of DVD sales and online DVD rentals is very different. First, the price to buy a new DVD fluctuates depending on how popular the DVD is, whether it is a new release and how successful the title originally was at the box office or on television. By contrast, online DVD rental customers are charged a flat subscription fee which does not changes based upon which DVD is bought. Second, once customers purchase a DVD it is theirs to keep and do with as they please. An online DVD rental, on the

other hand, still belongs to the rental company and must be returned at some point. Third, whether a DVD is new or used is not an issue in the rental market (customers actually expect and understand they are obtaining a used DVD), but is a significant factor in sales, for used DVDs are sold at a significant discount to their new counterparts.

## MARKET AND MONOPOLY POWER

31. At all times during the Class Period, Netflix had monopoly or market power and/or economic power in the relevant online DVD rental market. Netflix has a market share of approximately 75% in the online DVD Rental Market, and is far and away the market leader in the online DVD Rental Market, with the next closest competitor, Blockbuster Online, controlling 20-25% of the market. As a result of this market share, Netflix had and continues to have market and monopoly power in the online DVD rental market because it has the power to control prices and/or exclude competition in this relevant market.

32. There are significant barriers to entry that prevent potential rivals from entering and successfully competing in the online DVD rental market, including having a large catalog of DVD titles available to customers and numerous shipping facilities located throughout the United States. These barriers have prevented the entry of new competitors and have forced the withdrawal of some companies who tried to enter the market. As Netflix CEO Reed Hastings has observed, "When you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can open a website. But the barriers to profitability are very large."

33. Since the implementation of the Market Division Agreement, the online DVD Rental Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster Online ("Blockbuster"), which possesses nearly all of the remaining 25% of the online DVD Rental Market that Netflix does not control. A few minor firms have shares of less than 1-2% of the market and the number of these minor firms is dwindling. During fiscal years 2005-2007 combined, Netflix earned nearly $4 billion in revenues and $1.3 billion in gross profit from renting DVDs to customers – a margin of more than 33%. As a result of Netflix' anticompetitive agreement and its abuse of its monopoly power alleged herein, its subscription fees have been higher than they otherwise would have been.

34. Wal-Mart Stores and its wholly-owned subsidiary Walmart.com combined have an industry-leading 40% of domestic DVD retail sales. During fiscal years 2005-2008 combined, they earned revenues in excess of $25 billion by selling DVDs to customers. Both Wal-Mart Stores and Walmart.com benefit from the Market Division Agreement.

35. Further evidence of Netflix' market and monopoly power is reflected in the anticompetitive effects alleged herein.

## THE ILLEGAL AGREEMENT

36. In early 2005, Netflix faced increasing competition from Walmart DVD Rentals and from Blockbuster Online, the latter of which had just entered the online rental market.

37. As a result of new entrants in the online DVD Rental Market, Netflix, in order to remain competitive was required to undertake price cuts. In 2004, Netflix' most popular service cost $21.99. When Blockbuster entered the online DVD Rental Market at that time, it started charging customers $19.99 but proceeded to reduce its price in late 2004 to $17.49. Walmart.com responded to these cuts by lowering the pricing on its most popular plan from $18.86 to $17.36. In the wake of these price cuts, Netflix soon reduced its prices by nearly 20% (to $17.99 per month). After that, Blockbuster further decreased its price to $14.99 – 20% below Netflix' already reduced price and more than 40% below the price that Netflix had been charging in the beginning of 2004.

38. Meanwhile, Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which had established themselves as the leader in new DVD sales, were facing increasing competition from in-store and online channels of distribution in new DVD sales, including competition from Amazon.com. At the time, Netflix was a significant potential additional competitor, since it had a subscriber base of millions of customers who were known in the industry to be prolific DVD buyers, and the sales and profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to these customers. Conversely, Wal-Mart Stores and Walmart.com stood to gain significant additional sales and profits and to gain further market share in the sale of new DVDs if these customers were to make their purchases of new DVDs from them instead.

39. On January 7, 2005, Walmart DVD Rentals dropped the price on its most popular DVD rental plan significantly – to $12.97 per month – creating further price pressure on Netflix to reduce its

DVD rental prices. In order to respond to the increased competition, Netflix would have been forced to lower its prices even further and thereby reduce its profits.

40. Faced with this increased competition, Reed Hastings, the Chairman and CEO of Netflix, called John Fleming, then the CEO of Walmart.com, and invited him to dinner to discuss their companies' DVD sales and rentals business. Fleming accepted the invitation, and during the dinner meeting, the two embarked upon a scheme that would eventually result in execution of the illegal Market Division Agreement.

41. On May 5, 2005, in Netflix' First Quarter earnings call with financial analysts, which held after the January dinner but before to the public announcement of the Market Division Agreement, Hastings made plain the motive for Netflix to conspire with Wal-Mart Stores and Walmart.com:

> In terms of profitability over the coming years, **the key issue is the number of major competitors.** If there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets. If, on the other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in online rental, then the profits would likely be small.

Hastings went on to "predict" that "online rental [would] become[] a two-firm market over the coming years." (Emphasis added.)

42. On May 19, 2005, shortly after Fleming had been promoted to Chief Marketing Officer of Wal-Mart Stores, Defendants issued a joint press release that revealed the existence of the Market Division Agreement, by which they unlawfully created the two-firm market that Hastings sought and had "predicted."

43. Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the online rental business. Walmart.com announced to all of the subscribers to "Walmart DVD Rentals" that is was exiting the online DVD rental business and that those subscribers could be transferred to Netflix. Walmart.com took additional steps to affirmatively implement the Market Division Agreement by adding a prominently placed link to the Netflix website to encourage customers to transfer their subscriptions to Netflix. Since the date of their joint announcement on May 19, 2005 (apart from the 30 days that Walmart.com used to wind down its existing online rental business), neither Walmart.com nor

Wal-Mart Stores has participated in the Online DVD Rental Market, and Netflix has not sold new DVDs.

44. As a result of the Market Division Agreement, downward pricing pressure from Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors. Absent the Market Division Agreement, Netflix would have lowered its prices no later than May 19, 2005. As a result of the elimination of a competitor in this relevant market, Blockbuster was able to raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per month, in accordance with Hastings' expectation that "[i]f there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets." In Netflix' next earnings call, on July 25, 2005, Hastings boasted: "Last quarter we said online rental was shaping up to be a two-player market, and that is indeed what is happening."

45. The Market Division Agreement was not in the independent self-interest of Wal-Mart Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have wanted Walmart.com to withdraw from the online rental market, encourage its subscribers to be transferred to Netflix, and promote Netflix' rental business absent substantial consideration from Netflix, such as an agreement not to compete for new DVD retail sales. But for the Market Division Agreement, Walmart.com would not have exited the online DVD Rental Market when it did. Likewise, Netflix would not have foreclosed its opportunity to sell DVDs to its millions of subscribers – a base of customers who purchase an average 25 DVDs per year each – and would not have promoted new DVD sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from them not to compete for Netflix' online DVD rental business.

## ANTICOMPETITIVE EFFECTS

46. Defendants' illegal acts and practices have caused anticompetitive effects in the online DVD Rental Market. The subscription fees charged by Netflix to Plaintiff, as well as the other members of the Class, were maintained at artificially high and supracompetitive levels. Plaintiff and the other members of the Class paid higher subscription prices to Netflix than they otherwise would have paid in the absence of the Market Division Agreement.

47. The Market Division Agreement (i) eliminated one of only three significant competitors in the Relevant Market, (ii) eliminated competition between Defendants, and (iii) enabled Netflix to acquire market power and also acquire and maintain monopoly power in the relevant market. The Market Division Agreement has enabled Netflix to implement monopolistic and supracompetitive pricing in the relevant market.

48. The Market Division Agreement and Defendants' acts and practices in furtherance thereof have no procompetitive benefits. They do not create information that customers need, nor do they create new or better products or services. Rather, they have served to reinforce the true anticompetitive nature of the Market Division Agreement by assuring, for example, that Walmart.com would withdraw from the online DVD Rental Market, further enhancing Netflix' power in that market. Even if there were any such benefits, those benefits do not outweigh the anticompetitive effects described herein, and, in any event, could have been achieved by less restrictive means.

## CLASS ACTION ALLEGATIONS

49. Plaintiff brings this action on their own behalf and on behalf of a Class of similarly situated individuals as defined below, pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

50. The "Class" on behalf of whom Plaintiff brings these claims is defined as:

> Any person in the United States who paid a subscription fee to Netflix to rent DVDs, on or after May 19, 2005 up to the present. Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, their parents, subsidiaries, and other affiliated entities.

51. The Class numbers in the millions, the exact number and identities of the members being known by Defendants.

52. The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

53. There are questions of law and fact common to the Class and the members thereof. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injuries sustained as a result thereof. The questions include, but are not limited to:

a. Whether Defendants engaged in a contract, combination, or conspiracy to Allocate markets;

b. Whether Defendants unreasonably restrained trade in the online DVD Rental Market;

c. Whether Defendant Netflix attempted to monopolize the online DVD Rental Market;

d. The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

e. Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

f. Whether the alleged contract, combination, and conspiracy violated Section 2 of the Sherman Act;

g. The anticompetitive effects of Defendants' violations of law;

h. Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

i. Whether the conduct of Defendants, as alleged in this Complaint, caused Netflix subscription fees to be higher than they otherwise would have been and thereby caused injury to the business and property of Plaintiff and other members of the Class.

54. The questions of law and fact common to the members of the Class, including those described above, predominate over questions affecting only individual class members.

55. Plaintiff's claims are typical of the claims of the class and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is direct purchasers of subscriptions to rent DVDs online from Netflix and their interests are coincident with, and not antagonistic to, those of the other members of the Class. In addition, Plaintiff is represented by competent counsel experienced in class action antitrust litigation.

56. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct of Defendants.

57. Defendants have acted, and refused to act, on ground generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

58. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist in the files of Defendant. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## ANTITRUST INJURY AND STANDING

59. During the Class Period, Plaintiff and the members of the class have directly paid monthly DVD subscription fees to Netflix in the United States, and many continue to do so.

60. Plaintiff and the members of the class has suffered, and many continue to suffer, injury of the type that the antitrust laws are designed to punish and prevent. Plaintiff and the members of the Class has paid, and many continue to pay, more to subscribe to Netflix than they would have paid, absent the Market Division Agreement. Plaintiff and the members of the Class was, and many continue to be, injured and financially damaged in their businesses and property, on account of Defendants' wrongful conduct. As the direct victims of Defendants' antitrust violations, Plaintiff are the most efficient enforcers of the antitrust claims made herein.

## COUNT ONE
### SHERMAN ACT SECTION ONE (15 U.S.C. § 1)
### Market Allocation of Online DVD Rental Market
### (Against All Defendants)

61. Plaintiff incorporates herein and make a part hereof, their allegations contained in paragraphs 1 through 60 above.

62. Defendants have entered into a *per se* illegal market division agreement, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Even if evaluated under the rule of reason, the

Market Division Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

63. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the online DVD Rental Market. In addition, Netflix, on the one hand, and Wal-Mart Stores and Walmart.com, on the other hand, were potential competitors in the new DVD sales market. Wal-Mart Stores and Walmart.com were actual participants and Netflix was a potential participant, with the means and economic incentive to sell new DVDs in the absence of the Market Division Agreement.

64. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of dividing the markets for online DVD rentals and new DVD sales. The Market Division Agreement allocated the online DVD Rental Market to Netflix, with Wal-Mart Stores and Walmart.com agreeing not to compete in that relevant market. The agreement also allocated new DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new DVDs in competition with them. In addition to explicitly or *de facto* agreeing not to sell new DVDs, Netflix also obtained the Market Division Agreement by providing potentially valuable promotion to Wal-Mart Stores and Walmart.com. In so doing, Netflix provided significant consideration to Wal-Mart Stores and Walmart.com for their agreement to withdraw from, and not compete in, the online DVD Rental Market.

65. The Market Division Agreement has created significant anticompetitive effects with no corresponding procompetitive benefits. It eliminated competition in the relevant market, raising prices paid by customers. To the extent that there are any procompetitive benefits at all resulting from the agreement, they do not outweigh the agreement's anticompetitive effects. In any event, to the extent that there are any, they could have been achieved by less restrictive means.

66. As a result of this violation of law, Netflix' subscription prices charged to, and paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

## COUNT TWO

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Monopolization of Online DVD Rental Market**
**(Against Netflix)**

67. Plaintiff incorporates herein and make a part hereof, their allegations contained in paragraphs 1 through 66 above.

68. Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits the willful monopolization of any part of the trade or commerce among the states.

69. The market for online rentals of DVDs constitutes a valid antitrust market. At all times relevant hereto, Netflix had monopoly or market power and/or economic power in the online DVD rental market.

70. Netflix has willfully acquired and maintained its monopoly in the online DVD Rental Market by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2

71. Netflix' monopolistic and exclusionary conduct in the relevant market cannot be tempered through normal market forces. There are significant barriers to entry that prevent competing companies from entering the online DVD rental market, including having a large catalog of DVD titles available to consumers and numerous shipping facilities located throughout the United States.

72. As a result of the unlawful conduct alleged herein, Netflix' has been able to charge supracompetitive prices and Plaintiff and the Class has paid subscription prices higher than they would have been but for the anticompetitive conduct.

## COUNT THREE

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2.)**
**Attempt to Monopolize Online DVD Rental Market**
**(Against Netflix)**

73. Plaintiff incorporates herein and make a part hereof, their allegations contained in paragraphs 1 through 72 above.

74. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the online DVD Rental Market. Prior to and at the time of

the agreement, Netflix and Walmart.com were actual competitors in the online DVD Rental Market. Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market. Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the Relevant Market by Netflix. Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

75. As a result of this violation of law, Netflix' subscription prices charged to, and paid by Plaintiff and the Class are, and have been, higher than they otherwise would have been.

## COUNT FOUR
### SHERMAN ACTION SECTION TWO (15 U.S.C. § 2)
### Conspiracy to Monopolize Online DVD Rental Market
### (Against All Defendants)

76. Plaintiff incorporates herein and make a part hereof, their allegations contained in paragraphs 1 through 75 above.

77. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the online DVD Rental Market. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the online DVD Rental Market. Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market. Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the relevant market by Netflix. Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

78. As a result of this violation of law, Netflix' subscription prices charged to, and paid by Plaintiff and the Class are, and have been, higher than they otherwise would have been.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that:

A. The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representatives, and that Plaintiff's counsel be appointed as counsel for the Class.

B. Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1-2.

C. The Court declare the Market Division Agreement between Defendants announced May 19, 2005, to be unlawful and null and void.

D. Judgment be entered for Plaintiff and members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiff and the Class, under Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15, together with the costs of the action, including reasonable attorneys' fees, and such other relief as is appropriate.

E. Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claims to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect, pursuant to Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 29.

F. Plaintiff and the members of the Class be awarded pre- and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date o service of the initial complaint in this action.

G. Plaintiff and the members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial of all issues triable by Jury.

DATED: January 20, 2009

Respectfully submitted,

**GIRARD GIBBS LLP**

By: 
Alex C. Turan

Daniel Girard
Elizabeth C. Pritzker
Alex C. Turan
**GIRARD GIBBS LLP**
601 California Street, Ste. 1400
San Francisco, CA 94108

Mary Jane Fait
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ, LLC**
55 W. Monroe Street, Suite 1111
Chicago, IL 60603

*Attorneys for Plaintiff Melanie Polk-Stamps*